# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,     )
*ex rel.* MARK R. GACEK, SR.,     )
                    )
    **Plaintiff,**          )
                    )
v.                    )    **CIVIL ACTION 14-0342-WS-B**
                    )
PREMIER MEDICAL MANAGEMENT,   )
INC., d/b/a PREMIER MEDICAL GROUP, )
                    )
    **Defendant.**       )

## ORDER

This matter comes before the Court on defendant's Motion to Dismiss (doc. 31).  The Motion has been extensively briefed via two full rounds of briefing (*see* docs. 31, 37, 41, 44) and is now ripe for disposition.

**I.    The First Amended Complaint.**

    ***A.    Nature of the Case.***

This is a *qui tam* action[1] brought by relator, Mark R. Gacek, Sr., M.D., on behalf of the United States and against named defendant, Premier Medical Management, Inc. ("Premier"), alleging multiple violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA").[2]

---

[1]      "A *qui tam* action permits a private individual, known as a relator, to bring an action on their own and the government's behalf. … If the government declines to intervene, the relator may continue with the action … and if successful, may recover between 25 and 30 percent of the judgment or settlement, plus reasonable expenses, attorney fees, and costs." *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1219 n.2 (11th Cir. 2012) (citations omitted).

[2]      As required by 31 U.S.C. § 3730(b)(2)-(5), the Government was given an opportunity to investigate Gacek's claims and to determine whether it wished to intervene in this action.  After a pair of investigative periods collectively spanning from August 2014 through January 2017, the Government announced its decision to decline intervention.  (Doc. 23.) Significant portions of the court file predating that Second Notice of Election to Decline
(Continued)

According to the well-pleaded allegations of the First Amended Complaint (doc. 21), Gacek is a former physician employee of, and former partner in, Premier, which is characterized as "one of the largest multi-specialty eye, ear, nose, and throat groups in the southeastern United States." (Doc. 21, ¶¶ 11-14.)  Gacek worked for Premier from 1997 until April 2013, at which time his employment was terminated for "repeatedly complaining about healthcare fraud and unethical medical practices" at Premier.  (*Id.*, ¶¶ 15-16.)

The bulk of the 31-page, 133-paragraph First Amended Complaint is devoted to setting forth the details of Premier's alleged fraudulent schemes, Gacek's unsuccessful efforts to stop them, and the termination of his employment.  (Doc. 21, ¶¶ 17-122.)  On the strength of these factual allegations, Gacek identifies five causes of action, all alleging violations of the FCA.  In Count I, Gacek asserts that Premier knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A) and/or § 3729(a)(1), thereby damaging the Goverment.  (*Id.*, ¶¶ 114-15.)  In Count II, Gacek alleges that Premier knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B) and/or § 3729(a)(2), thereby damaging the Government.  (*Id.*, ¶¶ 117-20.)  Count III is a claim of retaliation pursuant to 31 U.S.C. § 3730(h), alleging that Premier terminated Gacek's employment because of his lawful efforts to stop Premier's violations of the FCA.  (*Id.*, ¶¶ 122-23.)  In Count IV, Gacek brings a claim of conspiracy, alleging that Premier conspired to violate the FCA "with regard to the performance of RAST procedures," in violation of 31 U.S.C. § 3729(a)(1)(C) and/or § 3729(a)(3), thereby damaging the Government.  (*Id.*, ¶¶ 125-26.)  Finally, Count V is a "reverse false claims" cause of action alleging that Premier failed to reimburse the Government for payments made by the Government for services procured in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).  In particular, Count V alleges that an unlawful internal kickback scheme for patient referrals among certain Premier physicians and staff created an obligation for Premier to reimburse the Government for payments received for services performed pursuant to those referrals.  By failing to reimburse those funds, the Complaint

---

Intervention (doc. 23) filed on January 13, 2017 remain sealed to protect the Government's interest in maintaining the confidentiality of the details of its investigation.

alleges, Premier violated the FCA, and specifically 31 U.S.C. § 3729(a)(1)(G) and/or § 3729(a)(1)(7).

The Amended Complaint describes three specific schemes on which these claims are predicated. The factual allegations concerning each such scheme will be summarized separately.

**B.      *Medically Unnecessary Allergy Testing.***

Gacek alleges that, beginning in 2000 and continuing through the present, he observed Premier physicians "routinely" subjecting young patients to an allergy blood test known by the acronym RAST. (Doc. 21, ¶ 18.) The Amended Complaint identifies certain shortcomings of RAST as a diagnostic test in the ordinary case (*i.e.*, high cost, long wait times, lack of sensitivity as compared to skin test alternative) and explains why such testing is generally inappropriate for very young children. (*Id.*, ¶¶ 20-25.) Notwithstanding these considerations, Gacek alleges that Premier "regularly and routinely performed RAST because RAST was more profitable than skin testing because Premier Medical could bill and receive payment from the Government on a higher volume." (*Id.*, ¶ 27.) Thus, one scheme alleged in the Amended Complaint is that Premier routinely presented false claims and made false statements to the Government "by billing and receiving payment for medically unnecessary RAST." (*Id.*)

As evidence of this purportedly false and fraudulent practice, the Amended Complaint attaches an October 2012 internal e-mail that purportedly demonstrates Premier's efforts to determine "which allergy test would yield the biggest economic gain," without regard to medical need or patient symptoms. (*Id.*, ¶¶ 28-30.) Gacek alleges that RAST was found to be "more profitable because it could be performed in higher volumes," and that after reaching that conclusion, Premier "used/uses RAST in the vast majority of all allergy testing." (*Id.*, ¶¶ 32-33.) According to the Amended Complaint, Premier double-billed the Government for both RAST and skin tests in connection with the October 2012 trial tests despite awareness "that both forms of allergy testing were not medically necessary," and that Gacek's objections to this practice were ignored. (*Id.*, ¶¶ 34-35, 40.) The Amended Complaint further documents the scheme by recounting a 2010 conversation in which Premier physicians indicated they "could also bill the Government for RAST" along with certain surgical procedures in order to increase revenues because Medicare/Medicaid reimbursement on surgeries was lower than that of private insurers. (*Id.*, ¶ 38.) Gacek alleges that Premier routinely performed RAST in surgical procedures from 2010 onward, and presented false claims and made false statements to the Government, but that

the allegedly false claims/statements and the specific information contained therein "are in the exclusive control of Premier Medical." (*Id.*, ¶ 39.) As an example, Gacek provides operative reports dated May 23, 2014 and May 30, 2014, showing instances in which Premier physicians administered RAST in connection with surgeries on very young patients. (*Id.,* ¶¶ 42-43 & Exhs. 1-2.) All told, Gacek estimates that from 2000 through 2013, Premier billed $30,000-$50,000 per month for medically unnecessary RAST, and identifies four specific physicians involved in such a scheme. (*Id.*, ¶¶ 46.)

## C. Up-Coding of Medical Procedures.

The second form of scheme set forth in the Amended Complaint involves Premier's alleged practice of "up-coding medical services for the purpose of fraud." (Doc. 21, ¶ 48.) Gacek states that Premier "routinely up-coded" facial cosmetic work and selective neck dissections more than 80% of the time "to obtain higher reimbursements per procedure." (*Id.*, ¶ 49.) As a specific example, the Amended Complaint documents an October 2006 incident in which a private insurer requested immediate reimbursement of $250,000 for facial cosmetic work (specifically, skin-tightening treatments) that Premier physicians had "up-coded and billed as Rosacea treatments in order for Premier Medical to obtain higher reimbursement." (*Id.,* ¶¶ 51-58.) Although the specific incident involved a private insurer, Gacek was told by one Premier physician that other Premier physicians were concerned that "Medicare, Medicaid, and other private insurance companies" would likewise discover the up-coding and request repayment. (*Id.*, ¶ 59.) At that time, Premier took no steps to "self-report[] the fraud to Medicare, Medicaid, or other private insurance companies." (*Id.*, ¶ 60.)

Another type of up-coding that Gacek alleges relates to selective neck dissections, in which cancerous lymph nodes are removed. (*Id.*, ¶¶ 62-64.) From 2000 through April 2013, the Amended Complaint alleges, Premier physicians fraudulently up-coded certain neck dissection procedures as other, more invasive procedures "on a routine basis in order for Premier Medical to obtain a higher reimbursement." (*Id.*, ¶¶ 63, 65.) For instance, Gacek points to a patient named F.H., whose post-operative report in December 2004 reflected that a Premier physician had performed an invasive form of neck dissection when in fact a less invasive procedure (subject to lower reimbursement) had been done, and "[u]pon information and belief" Premier billed and received payment from Medicare for the more invasive procedure. (*Id.*, ¶¶ 68-77.) Gacek indicates that the fraudulently billed claims or statements, and the specific information

contained therein, "are in the exclusive control of Premier Medical." (*Id.*, ¶ 77.) Gacek also discusses the example of patient R.B., as to whom Premier billed Medicare for an emergency surgery to clear an airway blockage in December 2010 when in fact there was no blockage and no need for emergency surgery. (*Id.*, ¶¶ 78-86.) Gacek characterizes this as fraudulent up-coding, and alleges "[u]pon information and belief" that Premier billed Medicare and received payment from the Government; however, Gacek also states that the fraudulently billed claims or statements, and the specific information therein, "are in the exclusive control of Premier Medical." (*Id.*, ¶ 86.)

### D. Kickbacks and Retaliation.

The third type of fraudulent scheme discussed in the Amended Complaint is an alleged "kickback scheme" pursuant to which certain Premier physicians "paid cash gifts" to front desk personnel / appointment clerks "for scheduling more patient appointments on the doctors' respective calendars." (Doc. 21, ¶¶ 89-90.) This scheme is alleged to have been "going on for several months" as of November 2010. (*Id.*, ¶ 89.) A front desk clerk named Cassandra apprised Gacek of the scheme, so Gacek confronted the supervising doctor. Shortly thereafter, Cassandra and certain non-physician employees involved in the kickbacks were fired. (*Id.*, ¶¶ 92-93.) According to the Amended Complaint, this scheme resulted in Premier "billing Medicare for tainted and illegal procedures," and receiving payment "from the Government for services performed pursuant to illegal referrals in violation of the Anti-Kickback Statute." (*Id.*, ¶ 94.) When Premier learned what had happened, Premier "failed to pay back to the Government money and/or funds it received as reimbursement payments from Medicare" relating to those tainted and illegal procedures. (*Id.*, ¶ 95.) Gacek alleges that fraudulent claims or statements, and the specific information therein, are "in the exclusive control of Premier Medical." (*Id.*)

The Amended Complaint alleges that Premier fired a nurse in January 2013 for complaining about the improper up-coding of medical services. (*Id.*, ¶ 102.) Moreover, Gacek alleges that he had numerous meetings with Premier executives (including both the CEO and the Doctor Manager) in 2011 and 2012 to discuss his concerns about unnecessary tests, up-coded billings, and the kickback scheme. (*Id.*, ¶¶ 97-101.) In January 2013, Premier requested Gacek's resignation. (*Id.*, ¶ 103.) When he declined to resign, Premier terminated his employment via open vote at a special shareholder meeting, effective April 20, 2013. (*Id.*, ¶¶ 104-06.) The

Amended Complaint alleges that Gacek's discharge "was a direct result of speaking out about Premier Medical fraudulent billing practices," as described above. (*Id.*, ¶ 107.)

## II. Applicable Legal Standards.

Premier now moves for dismissal of the Amended Complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief can be granted. Premier argues that the Amended Complaint is procedurally improper and should be dismissed for noncompliance with Rule 15(a), Fed.R.Civ.P. It asserts that the retaliation claim set forth at Count III is time-barred. And it contests the sufficiency of Counts I, II, III, IV and V to state actionable claims under the False Claims Act and governing pleading standards.

Ordinarily, to withstand Rule 12(b)(6) scrutiny and satisfy Rule 8(a), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face," so as to "nudge[] [its] claims across the line from conceivable to plausible." *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). "This necessarily requires that a plaintiff include factual allegations for each essential element of his or her claim." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1254 (11th Cir. 2012). Thus, minimum pleading standards "require[] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. As the Eleventh Circuit has explained, *Twombly / Iqbal* principles require that a complaint's allegations be "enough to raise a right to relief above the speculative level." *Speaker v. U.S. Dep't of Health and Human Services Centers for Disease Control and Prevention*, 623 F.3d 1371, 1380 (11th Cir. 2010) (citations omitted). "To survive a Rule 12(b)(6) motion to dismiss, the complaint does not need detailed factual allegations … but must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010) (citations and internal quotation marks omitted).

Notwithstanding this general pleading standard, the parties correctly recognize that the heightened standard of Rule 9(b) also applies to Gacek's fraud-based FCA claims. *See, e.g., United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (complaint alleging violations of the FCA "must comply with Rule 9(b)'s heightened

pleading standard"); *United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1308-09 (11th Cir. 2002) ("we now make clear that Rule 9(b) does apply to actions under the False Claims Act"). "A False Claims Act complaint satisfies Rule 9(b) if it sets forth facts as to time, place, and substance of defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Hopper v. Solvay Pharmaceuticals, Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (citations and internal quotation marks omitted). "If Rule 9(b) is to carry any water, it must mean that an essential allegation and circumstance of fraudulent conduct cannot be alleged in … conclusory fashion." *Clausen*, 290 F.3d at 1313. In the FCA context, the objective of Rule 9(b) is to "alert[] defendants to the precise misconduct with which they are charged and protect[] defendants against spurious charges." *Matheny*, 671 F.3d at 1222 (citation omitted).

Of course, the Rule 9(b) particularity requirement "must be read in conjunction with Federal Rule of Civil Procedure 8's directives that a complaint need only provide a short and plain statement of the claim," and courts considering motions to dismiss for failure to plead fraud with particularity "should always be careful to harmonize the directives of [R]ule 9(b) with the broader policy of notice pleading found in Rule 8." *Hill v. Morehouse Medical Associates, Inc.*, 2003 WL 22019936, *3 (11th Cir. Aug. 15, 2003) (citations and internal quotation marks omitted). In other words, the two pleading standards are considered together, such that "[i]n an action under the False Claims Act, Rule 8's pleading standard is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b)." *Urquilla-Diaz v. Kaplan University*, 780 F.3d 1039, 1051 (11th Cir. 2015).

**III.    Analysis.**

   *A.    Whether the First Amended Complaint Violates Rule 15(a).*

As an initial matter, Premier argues that the Amended Complaint must be dismissed in its entirety as violative of Rule 15(a) of the Federal Rules of Civil Procedure. Gacek filed his Amended Complaint (doc. 21) on November 3, 2016, more than two years after filing his original Complaint (doc. 2) on July 23, 2014. He neither requested nor obtained leave of court to file the Amended Complaint; rather, plaintiff proceeded under Rule 15(a)(1), which provides that "[a] party may amend its pleading once as a matter of course within … 21 days after service of a responsive pleading or … a motion under Rule 12(b), (e), or (f), whichever is earlier." Rule 15(a)(1)(B), Fed.R.Civ.P. Premier insists that Rule 15(a)(1)(B) is inapplicable and that Gacek

could not amend his complaint as a matter of course until after Premier filed a responsive pleading or Rule 12(b) motion, which did not happen until March 27, 2017. Thus, Premier's position is that no right to amend once as a matter of course exists under Rule 15(a)(1)(B) until a motion to dismiss or Rule 12(b) motion is filed. (Doc. 41, at 14 ("the rule allows a plaintiff to amend its complaint as a matter of course within a 21 day window that *begins on the date of service of the defendant's answer or motion to dismiss*").)

Defendant's interpretation lacks supporting case citations. Moreover, it is fundamentally inconsistent with the longstanding practice in this District Court, pursuant to which plaintiffs are routinely permitted to amend their complaints once as a matter of course <u>at any time</u> from the date they are filed until a date 21 days after service of a responsive pleading or motion to dismiss. Under defendant's reading of Rule 15(a)(1)(B), a plaintiff wanting to amend his complaint one day after filing it must wait until a responsive pleading is filed before the Federal Rules of Civil Procedure would allow him to file an amended complaint as a matter of course. That is not what Rule 15(a)(1)(B) says.[3] Premier's construction would be terribly inefficient, because a defendant might go to the trouble of preparing and filing a lengthy Rule 12(b) motion to attack a defect in the complaint that the plaintiff already intended to correct by amendment, but that the plaintiff was prohibited from correcting as a matter of course until a 21-day window opened after said Rule 12(b) motion was filed. Such a prohibition on pre-answer amendments as a matter of course would make no sense. And it would be contrary to extant case law. *See, e.g., Swanigan v. City of Chicago*, 775 F.3d 953, 963 (7th Cir. 2015) ("Because no responsive

---

[3]  The only authority on which Premier relies is the section of the Advisory Committee Notes to the 2009 Amendments to Rule 15 that explains why the right to amend once as a matter of course was being modified to treat answers and motions to dismiss the same, in terms of a plaintiff's right to amend once as a matter of course. (Doc. 41, at 14.) Nothing in the Advisory Committee Notes purports to extinguish the right of a plaintiff to amend his complaint once as a matter of course <u>before</u> an answer or Rule 12(b) motion is filed. Previously, Rule 15 allowed such amendments as a matter of course. *See, e.g., Coventry First, LLC v. McCarty*, 605 F.3d 865, 869 (11th Cir. 2010) ("Federal Rule of Civil Procedure 15(a) gives a plaintiff the right to amend a complaint once as a matter of course, so long as no responsive pleading has been filed."). The 2009 Amendments did not alter that aspect of the rule.

pleading or motion to dismiss had been filed, the 21-day clock under Rule 15(a)(1)(B) never started and Swanigan retained the right to amend his complaint.").[4]

In short, the Court finds that Gacek was entitled to amend his Complaint without leave of court on November 3, 2016. Accordingly, the Amended Complaint was properly filed as a matter of course pursuant to Rule 15(a)(1)(B). The Motion to Dismiss is **denied** insofar as it seeks dismissal of the Amended Complaint as violative of Rule 15.

**B.      Whether the Retaliation Cause of Action (Count III) is Time-Barred.**

Another aspect of the Motion to Dismiss that may be dispatched in short order is Premier's argument that Gacek's retaliation cause of action (Count III) is time-barred. Movant contends that Count Three is untimely based on the following reasoning: (i) Gacek alleges that Premier terminated his employment in April 2013 for speaking out about fraudulent billing practices (doc. 21, ¶¶ 106-07); (ii) Gacek's retaliation claim is subject to a three-year limitations period by operation of 31 U.S.C. § 3730(h)(3);[5] and (iii) Gacek's Amended Complaint was filed on November 3, 2016,[6] after expiration of the three-year period. (Doc. 31, at 21-22.)

---

[4]      *See also In re Alfes*, 709 F.3d 631, 639 (6th Cir. 2013) (Rule 15(a)(1) "gives plaintiffs an absolute right to amend their complaint one time before a responsive pleading is served') (citation omitted); *Rosin v. Thaler*, 417 Fed.Appx. 432, 434 (5th Cir. Mar. 11, 2011) (under Rule 15(a), "Rosin was entitled to amend his pleading once as a matter of right because the respondent had not yet filed a responsive pleading"); *Galustian v. Peter*, 591 F.3d 724, 730 (4th Cir. 2010) ("Peter had not yet filed a responsive pleading. ... Galustian then had a right to amend his complaint, with or without leave of the court to do so."); *Barrientos Arita v. Victor's Café, LLC*, 2015 WL 12672721, *1 (S.D. Fla. Nov. 17, 2015) ("The Amended Complaint was filed before the Defendant served any responsive pleading and was, therefore, timely" under Rule 15(a)(1)).

[5]      The False Claims Act provides that an employee is entitled to be made whole if he or she "is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee ... to stop 1 or more violations of" the Act. 18 U.S.C. § 3730(h)(1). A civil action under that subsection "may not be brought more than 3 years after the date when the retaliation occurred." 18 U.S.C. § 3730(h)(3).

[6]      Premier's Motion alleges that Gacek filed his Amended Complaint on "November 3, 2017" (doc. 31, at 21), which is plainly a typographical error. The correct filing date is November 3, 2016.

Defendant fails to explain, however, why it contends that the filing of the Amended Complaint (as opposed to the original Complaint) is the applicable date for limitations purposes. After all, Gacek filed the first iteration of his Complaint in this District Court on July 23, 2014, well within the § 3730(h)(3) limitations period. (*See* doc. 2.) Although the original Complaint is under seal, it does include specific allegations concerning Premier's firing of Gacek in April 2013. (Doc. 2, ¶¶ 81-84.) Moreover, the Complaint pleaded a retaliation claim under § 3730(h) based on allegations that "Gacek was discharged, harassed and/or discriminated against in his termination by Defendant Premier Medical … because of lawful acts done by Relator Gacek … including, but not limited to, Relator Gacek's efforts to stop violations of the False Claims Act." (*Id.*, ¶ 99.) In fairness to Premier, it constructed its timeliness argument without access to the sealed original Complaint; however, the fact remains that defendant's apparent assumption that Gacek never raised a retaliation claim until November 2016 is unfounded. To the contrary, Gacek pleaded a § 3730(h) retaliation claim against Premier in his Complaint filed in July 2014, well within the three-year limitations period. As such, defendant's argument that Count III should be dismissed as time-barred misses the mark, and that aspect of its Motion to Dismiss is **denied**.[7]

## C.     *Sufficiency of Pleading Counts I and II.*

As indicated, Count I alleges that Premier is liable under the FCA because it "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Similarly, Count II alleges that Premier is liable under the FCA because it "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material

---

[7]     In a footnote in its Reply, Premier raises for the first time an argument that Count III is somehow improper because "[a]n FCA retaliation claim is personal to the relator" and "Gacek, individually, is not a party" to this action. (Doc. 41, at 2 n.3.) As a general rule, federal courts do not consider new arguments raised for the first time in reply briefs. *See, e.g., Brown v. CitiMortgage, Inc.*, 817 F. Supp.2d 1328, 1332 (S.D. Ala. 2011) ("New arguments presented in reply briefs are generally not considered by federal courts.") (citations omitted); *Kirksey v. Schindler Elevator Corp.*, 2016 WL 7116223, *6 (S.D. Ala. Dec. 6, 2016) ("this argument is improper because it is newly raised in a reply although it was available earlier"); *United States v. Crumb*, 2016 WL 4480690, *17 (S.D. Ala. Aug. 24, 2016) ("this kind of new, previously available argument in support of a motion is not appropriately presented for the first time in a reply"). This argument could have been presented in Premier's principal brief, but was not. Therefore, the Court will not consider it at this time.

to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).  As Premier correctly observes, the Eleventh Circuit requires that such claims be pleaded with particularity, pursuant to the teachings of the leading case, *U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301 (11th Cir. 2002).

For a "presentment clause" claim under § 3729(a)(1)(A), "Rule 9(b) requires that actual presentment of a claim be pled with particularity," meaning that the complaint must "assert the who, what, where, when, and how of fraudulent submissions to the government." *Hopper*, 588 F.3d at 1327 (citation and internal quotation marks omitted).  Thus, "[i]n order to plead the submission of a false claim with particularity, a relator must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result." *Matheny*, 671 F.3d at 1225 (requirement satisfied where "Relators pled specifics relating to the submission of a specific statement in a specific document, submitted by a specific person during a specific review, as required by a particular government contract"); *see also Britton ex rel. U.S. v. Lincare Inc.*, 634 Fed.Appx. 238, 241 (11th Cir. Dec. 10, 2015) (FCA presentment clause claim inadequately pleaded where plaintiff "is unable to muster any facts tending to show that Lincare asked the Government to pay amounts it does not owe," "disclaims any knowledge of Lincare's billing practices," and "does not allege the who, what, where, when, and how of fraudulent submissions to the government") (citation and internal quotation marks omitted).

Likewise, for a "false statement" claim under § 3729(a)(1)(B), a plaintiff must plead with particularity that "(1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) the defendant's false record or statement caused the government to actually pay a false claim." *Hopper*, 588 F.3d at 1327; *see also Urquilla-Diaz*, 780 F.3d at 1052.[8]

---

[8]     That said, the Eleventh Circuit has left open the possibility that the particularity requirements may be relaxed in a "false statement" claim as to the details of the false claims themselves. *See Hopper*, 588 F.3d at 1329 ("The identity of the person or entity who submitted a or caused to be submitted a claim for payment is not an element of a [§ 3729(a)(1)(B)] cause of action.  So, in the appropriate case, we may consider whether the particularity requirements of Rule 9(b), as to the details of the alleged false claims at issue, are more relaxed for claims under 31 U.S.C. § [3729(a)(1)(B)] than for claims under [§ 3729(a)(1)(A)].").

Premier's position, quite simply, is that Gacek's Amended Complaint lacks this required level of detail. The argument resonates. On its face, the Amended Complaint fails to identify the who, what, where, when, and how of Premier's false submissions to the Government. It does not recite specific statements in specific documents, submitted by specific persons during specific times, to specific government programs. It fails to point to particular bills or claims that were submitted to the Government for payment, the dates of service accompanying such bills, the dates of such bills, the patients to whom they relate, the agency to which they were submitted, or the person at Premier who sent them. It does not plead with particularity that the Government actually paid false claims in reliance on any false records or statements that may have been submitted by Premier.

In response, Gacek does not suggest that his Amended Complaint comports with the level of detail demanded in the *Clausen* line of authorities. Instead, plaintiff maintains that "*Clausen* is not to be strictly applied in every FCA lawsuit," and that "[w]here a relator's complaint provides other 'indicia of reliability' to support the relator's beliefs and allegations that a defendant submitted fraudulent claims to the government, a more flexible case-by-case approach to *Clausen* may be applied." (Doc. 37, at 5.) Although defendants sharply criticize this characterization of the law, Gacek is correct. The "indicia of reliability" language has long been featured in Circuit precedents describing the FCA pleading standard. In *Clausen* itself, the Eleventh Circuit opined that "if Rule 9(b) is to be adhered to, some indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made to the Government." *Clausen*, 290 F.3d at 1311. More recently, the court explained, "We evaluate whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1358 (11th Cir. 2006); *see also United States ex rel. Mastej v. Health Management Associates, Inc.*, 591 Fed.Appx. 693, 704 (11th Cir. Oct. 30, 2014) (explaining that "there is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim," and that "other means are available to present the required indicia of reliability that a false claim was actually submitted").

The Eleventh Circuit's decision in *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir. 2006), is instructive. In *Atkins*, the relator was a psychiatrist who provided medical care, and he described in detail an elaborate scheme for defrauding the government by

submitting false claims, including particular patients, dates and corresponding medical records. Nonetheless, the Eleventh Circuit concluded that his complaint flunked Rule 9(b). The problem was that "Atkins fails to provide the next link in the FCA liability chain: showing that the defendants *actually submitted* reimbursement claims for the services he describes. Instead, he portrays the scheme and then summarily concludes that the defendants submitted false claims to the government for reimbursement." *Id.* at 1359. The necessary indicia of reliability were absent because "Atkins does not profess to have firsthand knowledge of the defendants' submission of false claims," inasmuch as he was responsible for providing care, and was "not a billing and coding administrator responsible for filing and submitting the defendants' claims for reimbursement." *Id.* Under these circumstances, *Atkins* concluded that "the public policies behind Rule 9(b), the FCA, and *qui tam* actions required the district court to dismiss Atkins's complaint under Rule 9(b); for it lacks sufficient indicia of reliability to haul the defendants into court." *Id.* at 1360 (footnote omitted).[9] More recently, in *Jallali v. Sun Healthcare Group*, 667 Fed.Appx. 745 (11th Cir. July 1, 2016), the plaintiff alleged that the defendant engaged in "improper internal practices" and that she had personal knowledge of "*patients* who were billed for services not rendered" and "billing fraud." *Id.* at 746. But she did not plead facts showing indicia of reliability to support an allegation that an actual false claim for payment was made to the Government; rather, the plaintiff "fail[ed] to allege that her general conclusion that the Defendants submitted to the Government false claims for payment is supported by anything other than conjecture or inference." *Id.* On that basis, the *Jallali* panel affirmed the dismissal of her FCA claim.

In applying this case-by-case approach to Rule 9(b)'s heightened pleading requirements in the FCA context, several principles emerge from Circuit jurisprudence. First, "a relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her

---

[9] The analysis in *Clausen* was much the same. The *Clausen* plaintiff provided detailed descriptions of the defendant's schemes to increase testing revenues; however, he fell short of Rule 9(b) because he failed to "provide any factual basis for his conclusory statement tacked on to each allegation that bills were submitted to the Government as a result of these schemes." *Clausen*, 290 F.3d at 1312. While indicating that it was "not unsympathetic" to his plight, the Eleventh Circuit also "reject[ed] Clausen's argument that we should apply a more lenient pleading standard because evidence of fraud was uniquely held by the defendant." *Id.* at 1314 & n.25.

employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims." *Mastej*, 591 Fed.Appx. at 704. Second, "a plaintiff-relator without first-hand knowledge of the defendants' billing practices is unlikely to have a sufficient basis for such an allegation." *Id.* And third, "[a]t a minimum, a plaintiff-relator must explain the basis for her assertion that fraudulent claims were actually submitted," and must do more than "state baldly that he was aware of the defendants' billing practices." *Id.* at 704-05.

Here, it is undisputed that Gacek has not provided exact billing data or sample claims to support an allegation that Premier submitted actual false claims for payment to the Government. While Gacek is correct that he may satisfy his pleading burden through other indicia of reliability, he still must plead a factual basis for his assertion that false claims were actually submitted to the Government. This he has not done.[10] In his briefs, Gacek holds forth at length about the indicia of reliability of his knowledge of Premier's purportedly fraudulent schemes and how they were implemented. That's all well and good, but it is not sufficient. From *Clausen* through *Atkins* and all the way through *Mastej* and *Jallali*, the Eleventh Circuit has consistently required a FCA plaintiff to plead facts showing a reliable basis of knowledge that the defendant actually submitted fraudulent claims to the Government in conjunction with the alleged scheme. "Because it is the submission of a fraudulent claim that gives rise to liability under the False Claims Act, that submission must be pleaded with particularity and not inferred from the circumstances." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005); *see generally Hopper*, 588 F.3d at 1328 ("Improper practices standing alone are insufficient to state a claim under either § 3729(a)(1) or (a)(2) *absent allegations that a specific fraudulent claim was in fact submitted to the government*.") (emphasis added). Gacek does not allege that he submitted fraudulent bills, that he worked in or supervised Premier's billing and coding department, or that he had first-hand observations of fraudulent bills being transmitted to the Government for payment. Nor does Gacek otherwise explain how he purports to know that the submission

---

[10] An example may help illustrate the point. In the Amended Complaint, Gacek pleads specific facts that on May 23, 2014, a Premier physician administered RAST on four patients in connection with ENT surgeries on patients age four and younger. (Doc. 21, ¶ 42.) But the Amended Complaint is devoid of particularized facts to show that Premier actually billed the Government for any of those purportedly unnecessary RAST treatments, or that the Government actually paid those purportedly fraudulent claims.

requirement is satisfied.[11]  Instead, he would apparently have the Court speculate or infer that there was an actual "submission" of a false claim to the Government.  The Eleventh Circuit refuses to indulge in such speculation or inference.  Thus, Count I (the § 3729(a)(1)(A) claim for "false presentment") must be dismissed as failing to comport with Rule 9(b)'s particularity requirements as to the submission of false claims.

Nor, for purposes of Count II (the § 3729(a)(1)(B) claim), does Gacek plead with specificity facts showing that the Government actually paid Premier claims containing false statements.  From review of the Amended Complaint, even if we were to assume that Premier made false records or statements to the Government, we would have to speculate that the Government actually paid Premier's false claims.  The Complaint is devoid of any facts showing that happened; therefore, dismissal of Count II is necessary for failure to satisfy Rule 9(b).  *See, e.g., Urquilla-Diaz*, 780 F.3d at 1052 ("to satisfy Rule 9(b)'s heightened-pleading requirements, the relator has to allege with particularity that the defendant's false statements ultimately led the government to pay amounts it did not owe") (citation and internal quotation marks omitted).

In light of the foregoing discussion, the Motion to Dismiss is properly **granted** as Counts I and II, neither of which meet the particularity requirements of Rule 9(b).

### D.      Sufficiency of Pleading Retaliation Claim (Count III).

In Count Three of the Amended Complaint, Gacek brings a retaliation claim.  That claim is predicated on an allegation that Premier discharged Gacek "because of lawful acts done by Relator Gacek in the furtherance of an action under the False Claims Act including, but not limited to, Relator Gacek's efforts to stop violations of the False Claims Act."  (Doc. 21, ¶ 122.) Such "efforts" are documented in the pleading, including the following assertions: (i) Gacek met with Premier's CEO in January 2011 "concerning medically unnecessary tests, up-coded medical

---

[11]      In his Sur-Reply, Gacek suggests that he has the requisite first-hand knowledge of the submission of false claims to the Government because of an e-mail he received on October 17, 2012 concerning unnecessary RAST tests.  (Doc. 44, at 4 ("Since Relator Gacek was one of the physicians who received the email he had sufficient personal and firsthand knowledge about who was billed for these tests.").)  But the subject e-mail (which is attached to the Amended Complaint as an exhibit) says nothing about "who was billed for these tests," much less anything about bills actually being submitted to the Government.  (*See* doc. 21, Exh. 5.)  Receipt of this e-mail may give Gacek knowledge about a fraudulent scheme by Premier, but it confers no first-hand knowledge or indicia of reliability to his conclusory statements about the actual submission of false claims to the Government.

services, and the inner-office kickback scheme" (*id.*, ¶ 97); (ii) at that meeting, Premier's CEO provided assurances that an internal investigation would be conducted, but Gacek never received any indication that such an investigation actually took place (*id.*, ¶ 98); (iii) over the next year and a half, Gacek met with the CEO and Doctor Manager "separately and on numerous occasions" (*id.*, ¶ 99); (iv) in September 2012, Gacek objected to Premier's CEO "that his concerns had routinely been overlooked" (*id.*, ¶ 100); (v) after that meeting, Gacek sent a letter to Premier's CEO following up on defendant's apparent "disinterest in investigating the fraud and unethical practice concerns that he had raised," but Premier never responded (*id.*, ¶ 101); and (vi) Premier demanded Gacek's resignation in January 2013 (*id.*, ¶ 103).

In its Motion to Dismiss, Premier contends that Count Three fails to state a claim for retaliation under 31 U.S.C. § 3730(h) and Rule 8(a), Fed.R.Civ.P., because it does not allege protected activity, specifically "that Premier 'feared' being reported to the government or sued by Gacek." (Doc. 31, at 18-19.)

The FCA provides a cause of action for an employee who is discharged "or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee … in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 18 U.S.C. § 3730(h)(1). That said, the Eleventh Circuit has cautioned that "§ 3730(h) only protected an employee from retaliation when there was at least 'a distinct possibility' of litigation under the False Claims Act at the time of the employee's actions." *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303 (11th Cir. 2010). The *Sanchez* panel noted that "an employee may put her employer on notice of possible False Claims Act litigation by making internal reports that alert the employer to fraudulent or illegal conduct." *Id.* at 1304 (citations omitted). The rule, then, is that "[i]f an employee's actions, as alleged in the complaint, are sufficient to support a reasonable conclusion that the employer could have feared being reported to the government for fraud or sued in a *qui tam* action by the employee, then the complaint states a claim for retaliatory discharge under § 3730(h)." *Id.* FCA retaliation claims do not hinge on allegations of fraud; therefore, the heightened-pleading Rule 9(b) standard is inapplicable to Count III. *Id.*

Gacek specifically pleaded that he complained internally to Premier on numerous occasions about fraudulent and unethical conduct relating to medically unnecessary tests, up-coding of medical services, and an unlawful kickback scheme. Such allegations of reported

misconduct, if true and if a link to Medicare/Medicaid billings were established, would violate the False Claims Act, and may subject Premier to civil or criminal liability for defrauding the Government. Under those circumstances, it is plausible to infer that Premier could have feared being reported to the Government or being sued by Gacek in a *qui tam* action. As such, the Court readily concludes that Count III traverses the *Twombly* / *Iqbal* plausibility threshold and states a claim upon which relief can be granted. Gacek has pleaded a short and plain statement showing a plausible claim for retaliation under § 3730(h). Nothing further was required. Accordingly, the Motion to Dismiss is **denied** as to Count III.[12]

### E.  Sufficiency of Pleading Conspiracy Claim (Count IV).

In Count IV of the Amended Complaint, Gacek brings a FCA claim against Premier for conspiracy "with regard to the performance of RAST procedures." (Doc. 21, ¶ 125.) The FCA creates a civil right of action against a defendant who conspires to violate § 3729(a)(1)(A) (presentment of a false or fraudulent claim for payment) or § 3729(a)(1)(B) (making or using a false record or statement material to a false or fraudulent claim). *See* 31 U.S.C. § 3729(a)(1)(C).

To state a claim for conspiracy under the FCA, a plaintiff must show "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello*, 428 F.3d at 1014; *see also United States v. LifePath Hospice, Inc.*, 2016 WL 5239863, *8 (M.D. Fla. Sept. 22, 2016) ("A defendant is liable for conspiracy if the relator can prove two elements: (1) that the defendant conspired with at least one person to get a

---

[12]     As the Court understands it, Premier's argument is that Gacek did not engage in protected activity because he did not explicitly tie his internal complaints of fraudulent billing activity to Medicare or Medicaid fraud, as opposed to private insurance fraud. But he did not have to do so. After all, the Complaint pleads that when Blue Cross Blue Shield of Alabama (a private insurer) had previously objected to Premier about improper upcoding of facial cosmetic work, Premier physicians held a meeting at which they "expressed fears that the federal government would get involved." (Doc. 21, ¶¶ 51-60.) This factual allegation demonstrates awareness by Premier that fraudulent practices alleged as to private insurers could lead to government investigation for fraud. Therefore, when Gacek later complained to Premier about fraudulent billing practices, it is reasonable to infer that Premier could have feared being reported to the Government for fraud even if Gacek's internal complaints did not single out Medicare/Medicaid claims. After all, Premier had raised precisely that fear years earlier when BCBS had raised concerns of improperly up-coded billings.

false or fraudulent claim paid by the government; and (2) that at least one of the conspirators performed an overt act to get a false or fraudulent claim paid."). A plaintiff asserting a § 3729(a)(1)(C) conspiracy claim must satisfy the heightened pleading requirements of Rule 9(b). *See, e.g., Corsello*, 428 F.3d at 1014 (dismissing FCA conspiracy claim "for failure to comply with Rule 9(b)"); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009) ("The particularity requirements of Rule 9(b) apply to the False Claims Act's conspiracy provision with equal force as to its 'presentment' and 'record' provisions.").

Premier argues that there cannot be a FCA conspiracy here because Gacek appears to be alleging "a conspiracy between Premier physicians and/or employees" (doc. 31, at 14), which cannot pass muster under the intracorporate conspiracy doctrine. For his part, Gacek embraces this characterization of Count IV, stating that his pleading "clearly allege[s] an intracorporate conspiracy between Premier and other employees." (Doc. 36, at 16-17.)

The general rule is that "[t]he intracorporate conspiracy doctrine bars conspiracy claims against corporate or government actors accused of conspiring together within an organization." *Rehberg v. Paulk*, 611 F.3d 828, 854 (11th Cir. 2010); *see also McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) ("Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves."). Nonetheless, Gacek properly invokes the criminal-conspiracy exception to this doctrine. The Eleventh Circuit has "long recognized an exception to the applicability of the intracorporate conspiracy doctrine for intracorporate criminal conspiracies arising under 18 U.S.C. § 371 of the federal criminal code." *McAndrew*, 206 F.3d at 1038 (footnote omitted). *McAndrew* extended that longstanding exception to reach civil rights conspiracies that also would constitute crimes, reasoning that public policy and legislative history "counsel in favor of a consistent application of the criminal conspiracy exception to the intracorporate conspiracy doctrine *regardless of whether the criminal conspiracy arises under the federal criminal or civil code*." *Id.* at 1040 (emphasis added). As *McAndrew* explained, the doctrine "was never intended nor used to shield conspiratorial conduct that was criminal in nature," and "there is no reason to differentiate between the criminal and civil conspiracy statutes" where the underlying conspiratorial conduct is the same. *Id.* at 1040-41. The conduct alleged by Gacek in the Amended Complaint, if proven at trial, would not only give rise to civil liability but also would be a criminal conspiracy in violation of 18 U.S.C. § 371.

Therefore, under the reasoning of *McAndrews*, the intracorporate conspiracy doctrine cannot and does not bar Gacek's Count III against Premier.[13]

In the alternative, Premier maintains that Count III has not been pleaded with the particularity required by Rule 9(b), because the Amended Complaint fails to provide details of the alleged FCA conspiracy "with regard to the performance of RAST procedures." (Doc. 21, ¶ 125.) Who conspired with whom? What was the agreement, the requisite meeting of the minds to defraud the Government? How did the conspiracy work? What overt actions were taken in furtherance of the conspiracy? Premier correctly observes that the Amended Complaint is devoid of specificity as to each of these issues.

In response to Premier's Rule 9(b) challenge to the § 3729(a)(1)(C) conspiracy claim, Gacek refers solely to paragraphs 28-34 of the Amended Complaint. (Doc. 37, at 16; doc. 44, at 3.) Those paragraphs concern the October 17, 2012 e-mail sent from Margaret Murray to more than a dozen recipients (identified in the Amended Complaint as ENT physicians at Premier) bearing the subject line "PRICK TESTS." (Doc. 21, Exh. 5.) This correspondence delineates a "trial procedure" for skin tests, indicates that the Allergy Department has supplies for 25 test patients to perform prick skin tests, and explains that "[w]e will run RAST also on a few select pts. … to compare during this trial period." (*Id.*) The e-mail states, "We will bill maximum allowed of $7.00 each and track reimbursement and report in 3-6 weeks." (*Id.*) It also reflects the author's observation that reimbursement is "quoted as about the same or slightly less for prick vs RAST … and our cost is considerably less," plus "insurance companies seem to be willing to pay for a greater number of this type tests in one day." (*Id.*) On its face, nothing in the October 17 e-mail memorializes an agreement among Premier physicians to defraud the Government by double-billing for both skin tests and RAST, by performing medically

---

[13]  *See United States ex rel. Harris v. Lockheed Martin Corp.*, 905 F. Supp.2d 1343, 1354 (N.D. Ga. 2012) (applying *McAndrew* to find that intracorporate conspiracy doctrine did not bar § 3729(a)(1)(C) claim against Lockheed Martin where complaint's allegations "plainly describe conduct that, if true, would be violative of both the civil liability provisions of the [FCA] and the criminal fraud conspiracy provisions of 18 U.S.C. § 371"); *United States ex rel. Beattie v. Comsat Corp.*, 2001 WL 35992080, *3 (M.D. Fla. Apr. 18, 2001) (in FCA context, agreeing with Government that "the conspiracy at issue between EMS and its employees is criminal in nature and invokes the logic found in the Eleventh Circuit's *McAndrew* opinion," such that intracorporate conspiracy doctrine did not bar FCA conspiracy claim).

unnecessary RAST, and so on.[14]  Although Gacek pleads that "Premier Medical billed and received payment from the Government for both RAST and skin tests" as a result of the October 2012 trial procedure (doc. 21, ¶ 34), he neither identifies any basis of first-hand knowledge of that fact (*i.e.*, the indicia of reliability discussed *supra*) nor points to any facts showing with specificity that Premier physicians and employees agreed to perform such double-billings to defraud the Government.

In light of the foregoing, the Court agrees with Premier that Gacek has failed to plead a FCA conspiracy cause of action under 31 U.S.C. § 3729(a)(1)(C) with the particularity required by Rule 9(b).  Upon careful review of the Amended Complaint, the undersigned discerns no specific factual allegations that Premier physicians had a meeting of the minds to defraud the Government as to RAST billings.  The pleading does not allege a specific agreement to double-bill for RAST and skin tests, or anything to show that the conspirators' purpose was to defraud the Government.  The "smoking gun" of the October 17, 2012 e-mail – on which Gacek relies so heavily – is, by itself, unhelpful to plead the existence of a conspiracy for Rule 9(b) purposes.  For all of these reasons, the Motion to Dismiss is **granted** as to Count IV.

> ### F.    Sufficiency of Pleading Reverse False Claim (Count V).

Count V of the Amended Complaint is a cause of action for a reverse false claim.  This type of claim arises, *inter alia*, where a defendant "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).[15]  Although somewhat convoluted, Gacek's theory (as pleaded in the Amended Complaint) works like this: There was an internal, unlawful kickback scheme in 2010 pursuant to which certain Premier physicians paid cash gifts to appointment clerks for shifting patient appointments to their calendars.  (Doc. 21, ¶¶ 89-92.)  Premier billed

---

[14]     If anything, the October 17 e-mail appears to describe a trial procedure under which Premier would use prick skin tests instead of RAST, and documents with specificity how the skin test works, the number of antigens tested for, the location of the skin tests on the patient's body and so on.  Thus, this exhibit appears to be exploring a potential move away from the RAST procedure that Gacek condemns in his Amended Complaint as being far more expensive than, and inferior to, skin tests.  (Doc. 21, ¶¶ 18-27, 44-46.)

[15]     "This is known as the 'reverse false claim' provision of the FCA because liability results from avoiding the payment of money due to the government, as opposed to submitting to the government a false claim."  *Matheny*, 671 F.3d at 1222.

Medicare for services performed by those physicians based on patient referrals that they received through that kickback scheme, and Medicare paid Premier for those services. (*Id.*, ¶¶ 94, 130.) This arrangement, the Amended Complaint pleads, is violative of the Anti-Kickback Statute ("AKS"), which provides in relevant part that it is a felony for a person to "knowingly and willfully offer[] or pay[] any remuneration … to any person to induce such person … to refer an individual to a person for the furnishing … of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(A).[16] According to Gacek, the AKS violation created an obligation on the part of Premier to reimburse the Government for payments it received for services provided by its physicians pursuant to that illegal kickback scheme.[17] Although Premier "was made aware that it had billed Medicare and received payments from the Government for services procured" in violation of the AKS, Premier failed to reimburse those funds. (Doc. 21, ¶ 131.) That is the reverse false claim.

Premier's only argument for dismissal of Count V is a conclusory assertion that Gacek "failed specifically to allege facts supporting a claim that Premier concealed or knowingly avoided or decreased an obligation to pay the government." (Doc. 31, at 18.)[18] But Premier

---

[16]     If proven, the pay-for-referral scheme described in the Amended Complaint would appear to violate the AKS. *See, e.g., Mastej*, 591 Fed.Appx. at 698 ("A violation of the Anti-kickback statute occurs when the defendant (1) knowingly and willfully, (2) pays money, directly or indirectly, to doctors, (3) *to induce the doctors to refer individuals* to the defendants for the furnishing of medical services, (4) paid for by Medicare."); *see also United States v. Vernon*, 723 F.3d 1234, 1252 (11th Cir. 2013) (similar).

[17]     This contention appears well-grounded in law. After all, the AKS provides that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31," 42 U.S.C. § 1320a-7b(g), which of course references the False Claims Act. By statute, the recipient of an "overpayment" (meaning funds to which the person is not entitled) of Medicare or Medicaid funds must promptly report and return the overpayment to the Government, which is an "obligation" for purposes of § 3729(a)(1)(G). *See* 42 U.S.C. § 1320a-7k(d).

[18]     To be sure, in its Motion to Dismiss, Premier raised a host of other arguments concerning Count V; however, those arguments were predicated on what Premier now acknowledges was a misinterpretation of the claim being asserted. (Doc. 41, at 12 ("It turns out, however, that Premier misinterpreted Count V.").) Thus, Premier's other contentions concerning Count V are of no consequence because they relate to a species of claim that is not being asserted by Gacek.

does not explain why it believes Count V's allegations are deficient to state a claim under § 3729(a)(1)(G). The Amended Complaint contains specific allegations (including names and dates) of the fraudulent conduct that Gacek says violated the AKS. These factual allegations bear the appropriate indicia of reliability for Rule 9(b) purposes. The Amended Complaint also alleges that Premier billed Medicare for services rendered by its physicians on referrals they had received in violation of the AKS, that the Government paid those claims, and that Premier knew about the AKS violation because Gacek himself had reported it to the supervising doctor in November 2010. Despite all of that, the Amended Complaint alleges, and the corresponding statutory obligation to repay the resulting overpayment to the Government, Premier failed to do so. Defendant has not identified what, exactly, about this narrative set forth in the Amended Complaint is insufficiently pleaded. The Motion to Dismiss is thus properly **denied** as to Count V.

**IV.  Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1.    Defendant's Motion to Dismiss First Amended Complaint (doc. 31) is **granted in part**, and **denied in part**;

2.    The Motion is **granted** as to Counts I, II, and IV, and those claims are all **dismissed**;

3.    In all other respects, the Motion is **denied**, and this action will proceed as to the retaliation cause of action set forth at Count III and the reverse false claim cause of action set forth at Count V; and

4.    Defendant's answer must be filed by no later than **July 14, 2017.**


DONE and ORDERED this 30th day of June, 2017.


s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE